**08 C 1220**

**JUDGE MORAN
MAGISTRATE JUDGE MASON**

# EXHIBIT 2

100 Rs.



# TECHNICAL KNOW HOW AND ASSISTANCE AGREEMENT

## DATED MARCH 26 ,2002

### BETWEEN

### BAROL CORPORATION

### AND

### LUXOR WRITING INSTRUMENTS PRIVATE LIMITED

## TECHNICAL KNOW-HOW AND ASSISTANCE AGREEMENT

THIS AGREEMENT is made this 22nd day of March , 2002 ("Effective Date") by and between Berol Corporation ("Berol"), organized and existing under the laws of the State of Illinois, having its principal place of business at 29 East Stephenson Street, Freeport, Illinois, U.S.A. Berol here also acts on behalf of its Affiliates, as defined below, who are along with Berol collectively and individually hereinafter referred to as the "Proprietor";

and

Luxor Writing Instruments Private Limited, a company organized under the laws of India and having its registered office at No. 5, Okhla Industrial Estate, Phase III, New Delhi 110 020 ("Licensee" which expression includes its permitted successors and assigns, if any).

WHEREAS

(a)  Proprietor is, inter alia, engaged directly or through its Affiliates in the business of manufacture, sale and supply, inter alia, of writing instruments and accessories thereto on a worldwide basis;

(b)  Proprietor has valuable knowledge, expertise and experience and possesses secret and specialized know-how, information and data in the field of manufacture of writing instruments and accessories therefor, and in particular relating to such products sold under the trademarks Parker, Waterman, Liquid Paper and Paper Mate;

(c)  The Licensee is engaged in the business of manufacture and marketing of the Products (as defined herein);

(d)  The Licensee has requested Proprietor to supply to it such secret and specialized technical know-how, information and data on a continuous basis as is required to manufacture and to market Products, and to operate the manufacturing facilities of the

1

Licensee, which Proprietor has agreed to do upon the terms and conditions hereinafter contained.

NOW, THEREFORE, IN CONSIDERATION OF THE PREMISES AND THE MUTUAL COVENANTS AND CONDITIONS, HEREINAFTER CONTAINED, THE PARTIES HERETO AGREE AS FOLLOWS:

**DEFINITIONS**

In this Agreement, the following words and expression unless inconsistent with the context, shall bear the meanings assigned thereto:

"Affiliates" are those companies controlled by, controlling, or under common control with Berol Corporation, all of which are, directly or indirectly, wholly-owned subsidiaries of Newell Rubbermaid, Inc. (Newell Rubbermaid, Inc. is not a party to this Agreement.)

"Agreement" shall mean this Technical Know-how & Assistance Agreement along with the Schedules hereto, and shall include any modifications and alterations hereto made in writing signed by both Parties after the date of execution of this Agreement.

"Approval" shall mean permissions, consents, validations, confirmations, licenses and other authorizations required to be obtained from the Government of India in order to implement the provisions of this Agreement including all permissions/authorizations from the Reserve Bank of India.

"Confidential Information" shall mean any information which is provided in a documentary or computer form, or other tangible or intangible form, and is designated as confidential by the person disclosing the same but shall not include any information which:

2

(i)     is already in the possession of the recipient at the date of this Agreement (provided such information was not supplied by a predecessor of Berol as provided below); or

(ii)    is or becomes generally available to the public through no fault of the recipient; or

(iii)   has already at the date of disclosure been developed as a result of the efforts of the recipient and not as a direct or indirect result of the disclosure of the same information by the disclosing Party or its predecessor; or

(iv)    which is obtained lawfully by the recipient from a third party who is not known to have obtained such information directly or indirectly from the disclosing Party or its predecessor.

Notwithstanding the foregoing exceptions (i) to (iv), confidential information provided to Licensee by a predecessor of Berol (e.g., an affiliate of The Gillette Company) in connection with the Luxor Joint Venture Agreements (as defined in the Supply Agreement) shall be considered Confidential Information hereunder, and shall remain protected under the confidentiality provisions of this Agreement.

"Equipment" shall mean the toolroom equipment, manufacturing equipment and quality control equipment specified by Proprietor.

"Ex-Factory Net Sale Price" shall mean the net ex-factory sale price of the Products, exclusive of excise duties, sales and other taxes, minus the cost of Standard Bought-Out Components and the landed cost of imported components (irrespective of source of procurement) inclusive of ocean freight insurance and customs duties.

"Intellectual Property" shall mean all Patents, designs, copyrights, trade secrets, Know-how, and other rights (other than trademark rights) commonly identified as intellectual property in and to information and materials, including Technical Documentation,

3

supplied by Proprietor to Licensee; all relating only to Products to be produced and sold under the Trademarks identified in each of the Trademark License and Registered User Agreements between Berol or its Affiliates and Luxor dated as of March 22, 2002 (each a "Trademark Agreement").

"Know-how" shall mean Proprietor's secret and specialized technical know-how, specifications, (for Products, including parts and components thereof, processes, incoming materials and quality), process descriptions and operating information, factory layout, factory management techniques, manufacturing techniques, engineering data, testing procedures, safety and environmental management, technical knowledge, design, inventions, developments, information and data, for the marketing, manufacture and quality control of the Products.

"Net Sale Price" shall mean the net sale price of the Products as invoiced by the Licensee after deduction of all discounts, taxes and duties.

"Party" shall mean and refer to Proprietor or the Licensee, as the case may be.

"Parties" shall mean and refer to Proprietor and the Licensee.

"Patents" shall mean any patents and registered designs in India that are owned by Proprietor or any of it Affiliates during the Term of this Agreement and which cover Products made by the Licensee.

"Product," whether used as a singular or plural, shall mean writing instruments and other stationery products expressly authorized by Proprietor for sale by Licensee, and produced and sold under the Trademarks identified in the Trademark Agreement, which is first manufactured or sold by Licensee after the Effective Date, or writing instruments and other stationery products that are modified to incorporate new or additional Intellectual Property after the Effective Date.

4

"Standard Bought-Out Components" shall mean any component incorporated into Products (i) that is not designed or produced by or for Proprietor, or any of its Affiliate companies, for incorporation into products, (ii) that has more than one application not limited to the particular Products, and (iii) that is not tailor-made to meet the requirements of Products, or is otherwise generally available.

"Supply Agreement" shall mean the Luxor Supply Agreement dated March 22, 2002 made between Parker Pen Products and Luxor Writing Instruments Ltd.

"Technical Documentation" shall mean all manuals, specifications, drawings, designs, layouts computer software or other means used for communicating the Know-how to the Licensee.

"Term" shall have the meaning as provided in Article 4.

## 1.    GRANT OF LICENSE

1.1    For the Term of this Agreement (as defined below), Proprietor hereby grants to the Licensee subject to the limitations and restrictions herein contained, the non-exclusive, non-transferable right and license to use and practice the Intellectual Property to manufacture and market the Products in India subject to the terms of this Agreement; except that such right shall be exclusive as to the use in the Territory with any Trademark licensed by Proprietor to Licensee on an exclusive basis under a Trademark Agreement.

1.2    All Products using, practicing or resulting from the Intellectual Property will be marked with one of the Trademarks in accordance with the terms of the Trademark Agreement.

## 2.    PROVISIONS OF KNOW-HOW AND TECHNICAL ASSISTANCE

5

2.1    Proprietor agrees to divulge and impart to the Licensee all Know-how (and the Technical Documentation relating thereto) necessary for manufacturing, packaging, and marketing Products under the Trademarks identified in the Trademark Agreement.

2.2    The Know-how shall be complete in all respects and shall be sufficient to enable Licensee to manufacture and market Products.

2.3    All the Know-how and the Technical Documentation are and shall remain the property of Proprietor and are agreed to be divulged and imparted to the Licensee as Confidential Information of Proprietor to be protected under the terms relating to confidentiality in this Agreement.

2.4    Based on the requirements of the Licensee and subject to their availability to Proprietor, Proprietor will make available the necessary specialized technical personnel from itself or its Affiliates to enable introduction and commissioning of the Equipment and the absorption of the Know-how.  Such personnel shall be made available to the Licensee on terms and conditions to be mutually agreed upon between the Parties and shall be subject to applicable regulations in force in India.   The local travel, accommodation and living expenses of such personnel shall be borne by the Licensee.

2.5    Proprietor will provide to the Licensee all such technical assistance as may reasonably be required by the Licensee to draw up plans for establishing, upgrading and improving the Licensee's toolroom and manufacturing facilities in relation to the manufacture of the Products.

2.6    The Parties will jointly use their commercially reasonable best efforts to ensure that the Licensee absorbs the Know-how fully and speedily and that the Products manufactured by the Licensee properly utilize the Know-how disclosed and imparted by Proprietor pursuant to this Agreement.

2.7    For all Proprietor technical personnel seconded to or visiting India pursuant to this Agreement, the Licensee agrees to use its best efforts to procure all necessary Indian

6

governmental permits and Approvals including visas to enable them to carry out their obligations to the satisfaction of the Parties to this Agreement.

2.8    Proprietor shall furthermore provide to the Licensee the ongoing technical assistance set out in the Schedule A hereto and shall advise and assist the Licensee in the correct interpretation of the Know-how and the Technical Documentation. Proprietor will remove, at its cost, deficiencies if any found in the Know-how or the Technical Documentation.

3.    **TRAINING**

3.1    During the Term of this Agreement, Proprietor shall receive such number of personnel of the Licensee for training in the manufacturing facilities of Proprietor or its Affiliates anywhere in the world, as may be agreed by Proprietor. Such personnel will be given on-the-job training by Proprietor in the use and practice of the Know-how and in the manufacture and quality control of the Products. All training shall be for such periods as may be mutually agreed upon between the Licensee and Proprietor. The Licensee shall obtain wherever applicable the prior Approval of the concerned Indian Government Authorities for the training of the Licensee personnel pursuant hereto by Proprietor or its Affiliates.

3.2    The Licensee shall be responsible for and shall pay and/or reimburse to Proprietor all local travel, accommodation and living expenses of technical personnel assigned by Proprietor or its Affiliates to provide training to Licensee.

3.3    The personnel of the Licensee assigned to Proprietor for training pursuant hereto shall have sufficient knowledge in their respective lines to benefit fully from the training and actively participate in their respective function. They shall also have sufficient working knowledge of the English language.

3.4    The Licensee personnel shall during their training in the manufacturing facilities of Proprietor or its Affiliates, observe all the rules and regulations of Proprietor and/or its

7

Affiliates, as the case may be, as are applicable to Proprietor's or its Affiliates' own employees. It is agreed and understood by the Parties that the personnel of the Licensee undergoing training pursuant to this Article shall during their training remain employees of the Licensee.

4.    **TERM AND TERRITORY.**

4.1    The Proprietor hereby grants to the Licensee for the Term of this Agreement the non-exclusive right to use the Intellectual Property in India.    The "Term" of this Agreement means six (6) years from the Effective Date written above.

4.2    Provided that Licensee is not in breach of this Agreement at the end of the Term, this Agreement shall be renewed for a second six (6) year Term beginning on the sixth anniversary of the Effective Date written above.

4.3    Proprietor reserves the right not to renew this Agreement for the second six (6) year Term specified in Section 4.2. Proprietor shall exercise this right by notifying Licensee of its intention not to renew this Agreement no less than one hundred eighty (180) days before the sixth anniversary of the Effective Date.

4.4    After the second six year term specified in Section 4.2, this Agreement may be renewed for one or more subsequent six (6) year Terms only upon written agreement of the Parties, it being expressly understood and agreed by the Parties that neither Party shall be obligated to enter into any agreement for such subsequent Terms, and that neither Party may claim any breach or damages if the other Party does not offer, accept, negotiate, or agree to any such subsequent Terms.

5.    **CONSIDERATION**

5.1    (a)    In consideration of Proprietor providing Know-how and technical assistance to the Licensee as provided herein, the Licensee shall pay Proprietor during the

8

Term a royalty, subject to taxes applicable in India, of five (5%) per cent of the Ex-Factory Net Sale Price of Products sold (net of returns) or otherwise disposed of by the Licensee, provided always that the royalty amount so computed shall not exceed two (2%) per cent of Net Sale Price of such Products. Such royalties shall be paid for no less than five (5) years from the date that a Product is first sold by Licensee, but in any event for so long as Licensee is permitted to do so consistent with Indian law.

(b)     Royalties shall be paid on a calendar quarterly basis and within forty-five days following the end of the calendar quarter for which they are payable. Royalties due shall be reported on a statement reflecting the amount of each Product sold during the quarter, and the Ex-Factory Net Sale Price of each Product, and the Net Sales of Products during that calendar quarter, which statement shall accompany the royalty payment. The royalty payment and statement shall be delivered to such address as designated in writing by Proprietor, or to the place where a notice to Proprietor is to be delivered. Proprietor shall be permitted from time to time, but no more often than once annually, to have an independent auditor audit Licensee's records to ascertain whether all royalties owed to Proprietor have been paid; and the failure to pay all royalties due shall be deemed a material breach of this Agreement.

(c)     Luxor shall register this Agreement with the Reserve Bank of India ("RBI") and seek the approval of the RBI to making payments to Proprietor in accordance with the terms and conditions of this Agreement.

5.2     The Products shall be considered as sold or otherwise disposed of, as the case may be, when invoiced or put to use.

5.3     The Licensee shall during the Term of this Agreement keep at its usual place of business true and particular accounts and records of the Products manufactured and sold or otherwise disposed of by it and of the amount of all royalties paid or payable pursuant hereto.

5.4    The royalties which are due shall, after conversion into US Dollars at the prevailing official rate of exchange on the date of remittance, subject to any required government Approvals, be remitted to Proprietor, after such Approval and with thirty (30) days after the end of each respective three (3) month period.

5.5    Upon commencement of commercial production of new Products from time to time under this Agreement, the Licensee shall immediately inform Proprietor in writing to that effect.

5.6    If the Licensee is required by Indian Law to withhold any income or similar tax from any sum payable hereunder, it shall withhold such taxes (or other statutory payment required to be paid by Licensee for Licensor's account and not on Licensee's account) and pay same to the appropriate authorities for the account of Proprietor, the Licensee shall obtain and promptly furnish to Proprietor, a receipt or certificate evidencing each such tax payment.

6.    **CONFIDENTIALITY AND INTELLECTUAL PROPERTY**

6.1    The Licensee undertakes to keep secret all the Technical Documentation and Know-how and other Confidential Information disclosed or communicated to it by Proprietor and undertakes not to disclose the same, either during the Term of this Agreement or thereafter, to any other person or enterprise, whether in or outside India. Proprietor will at the time of disclosure of the Know-how indicate to the Licensee its status as confidential and will stipulate any additional special safeguards Proprietor considers should be applied to keep the information secret.

6.2    The steps to be taken by the Licensee to protect Confidential Information hereunder shall include preventing disclosure thereof to its employees or subcontractors except and to the extent necessary in the performance of their duties and so long as such disclosure does not enable them to manufacture the Products on their own. The employees or subcontractors who have access to such information shall be bound to treat all such information as confidential, and the Licensee shall require those employees and

10

subcontractors to sign an undertaking to this effect.    The obligation to protect the confidentiality of Confidential Information shall survive for five (5) years from the date of termination or expiry of this Agreement.

6.3    Proprietor declares that to the best of its knowledge, information and belief no patents, registered design or other similar industrial property rights of third parties in India shall be infringed by the use and practice of the Know-how by the Licensee in accordance with this Agreement.    Should the Licensee suffer any loss, damage or incur any costs on account of breach of this representation by the Proprietor, or on account of application or use of the Know-how or Intellectual Property by the Licensee in accordance with this Agreement, then Proprietor shall at all times indemnify and keep indemnified the Licensee against any such loss or damage suffered or costs incurred by the Licensee. The Licensee shall promptly pass on for settlement or/and for defense, as Proprietor may decide, all such claims, demands, actions, suits or proceedings that may be made by any person on or against Licensee.    The indemnification obligations of Proprietor under this Section 6.3 shall survive termination of this Agreement.    It is clarified that the Proprietor shall not be required to indemnify Licensee in respect of any liabilities that arise or accrue to the Licensee on account of Licensee's failure to use the Know-how or Intellectual Property in accordance with the terms of this Agreement or on account of the Licensee's failure to (a) pass on any third-party claim, within ten (10) days of Licensee's notice of such claim, to Proprietor for defense or settlement; or (b) provide reasonable assistance (in the form of access to personnel, documents, facts, and information) to Proprietor for defending or settling such claim.

6.4    The Licensee shall within thirty (30) days of receipt of any claims, demand, actions, suits or proceedings referred to in Section 6.3, give in writing a notice to Proprietor of any such claims, demands, actions, suits and proceedings.    Proprietor shall have the sole charge and direction of the defense thereof, and the Licensee shall render all reasonable assistance in connection therewith to Proprietor.

6.5    Proprietor shall have the right to acquire immunity from any such claim, demand, action, suit or proceedings by settlement or by making any alterations to the Know-how

or to the processes or products of the Licensee incorporating such Know-how provided such settlement does not prejudicially affect the Licensee or its rights hereunder.

6.6   It is agreed and understood between the Parties that any license granted by Proprietor or its predecessor in interest to the Intellectual Property, which permitted Licensee to enjoy the use of any of the Intellectual Property before the Effective Date, shall be deemed to have extended up to and including the Effective Date, and to have been granted by Proprietor, and that no use of the Intellectual Property prior to the Effective Date shall be considered to have been unlicensed by the owner of such Intellectual Property.

## 7.   EVENTS OF DEFAULT AND TERMINATION

7.1   If (a) a receiver, liquidator or trustee of Proprietor or Licensee shall be appointed or a petition in bankruptcy or to reorganize shall be filed in relation to a Party; or (b) Proprietor or Licensee files a petition in voluntary bankruptcy or reorganization (excluding any reorganization without winding-up or any form of solvent reorganization); or (c) Proprietor or Licensee files a petition for arrangements, reorganization or bankruptcy pursuant to any law providing for the relief of debtor; or (d) Proprietor or Licensee institutes any proceedings for dissolution or liquidation or makes an assignment or mortgages for the benefit of creditors generally, or admits in writing its inability to pay its debts generally as they may become due, or consents to the appointment of a receiver, trustee or liquidator; then the other Party shall have the right to terminate this Agreement with immediate effect.

7.2   In the event that either party commits a material breach of any of the terms of this Agreement, which is not cured within thirty (30) days from the date of such notice to cure such breach. If (a) the breaching Party fails to cure such breach within thirty (30) days from the date of the notice of breach, or (b) if such breach is not curable within thirty (30) days, and the breaching Party fails to take such steps as possible to cure such breach in the most efficacious manner; this Agreement shall be terminated as of the end of such

12

thirty (30) day period. Licensee undertakes that in the event of termination, it shall cease to use the Intellectual Property.

7.3    (a)    Termination of the Supply Agreement shall entitle the Proprietor to terminate this Agreement by written notice with immediate effect.

(b)    Termination of a Trademark Agreement shall entitle the Proprietor to terminate this Agreement by written notice with immediate effect.

7.4    This Agreement may be terminated with the mutual written agreement of the Parties.

7.5    In the event of termination of this Agreement, the Licensee or any successor to any or all of the assets or business of the Licensee will, at the sole expense of Proprietor, deliver to Proprietor or to a person, firm or corporation designated in writing by Proprietor, all copies of Technical Documentation and Confidential Information.

7.6    In case of termination of this Agreement, neither of the Parties shall be released from any liability/obligation which would have accrued to a Party up to the date of termination, and the Party in breach shall remain liable for the consequences of that breach.

7.7    In case of termination of this Agreement, all the licenses and rights granted under this Agreement by Proprietor, to the Licensee shall be revoked and cease to be effective or in force, save and except that when this Agreement is terminated by Licensee for reasons attributable solely to Proprietor the Licensee may continue production of products in the Licensee manufacturing facilities applying the Know-how that was already in use therein during the period this Agreement was in force and effect. Nothing in this Section shall be deemed to grant Licensee the right to use any Trademark after the expiration of an applicable Trademark Agreement.

13

7.8    The confidentiality and other obligations of the Licensee under Article 6 above shall survive termination of this Agreement.

7.9    If, in the event of termination of this Agreement other than by reason of breach by Proprietor, the Licensee (save and except to the extent provided herein) continues to manufacture the Products in contravention of any specific stipulations in this Agreement, Proprietor shall notwithstanding and without prejudice to other remedies available to it, also be entitled to royalties as stipulated in this Agreement during the period of such continued manufacture.  The acceptance of royalties as mentioned herein by Proprietor shall not be deemed to be a waiver of any breach or of other right to terminate the Agreement or any particular remedy which may be available.

8.    **RELATIONSHIP**

The Licensee agrees that the relationship between Proprietor and the Licensee under this Agreement is that of principal to principal, with the parties acting as independent contractors.  The Licensee's rights and obligations hereunder are exclusive to the Licensee and may not be assigned or sub-licensed by the Licensee, either in whole or in part.

9.    **FORCE MAJEURE**

During the continued effect of any force majeure the time for fulfillment of obligations under this Agreement will be extended.  For this purpose the expression "Force Majeure" shall include circumstances beyond the reasonable control of the Party in question particularly but not limited to labor disputes or difficulties, official intervention of any kind and the refusal or delayed grant of any kind of official consent or, Approval so far as it interferes with the implementation of this Agreement.

10.    **GOVERNING LAW; FORUM SELECTION**

(a)    This Agreement shall be governed by the laws of India.

14

(b)    Each Party irrevocably consents and submits to the exclusive jurisdiction of the courts of the United States of America, and the respective States comprising the United States of America, to interpret and enforce this Agreement in accordance with governing law as set forth above.  Any dispute arising under this Agreement shall be adjudicated in the United States District Court located in Chicago, Illinois, USA, and if that court is without subject matter jurisdiction over a dispute, then that dispute shall be adjudicated in the Circuit Court of Cook County, Illinois, located in Chicago, Illinois, USA; and each Party irrevocably consents to such venue for adjudicating any such dispute, and agrees not to seek any change of venue for any reason.  Each Party also agrees that the final adjudication of any such dispute by such courts, following final disposition of any appeals by either Party, shall be enforceable according to its terms in the courts of India or any of its states, and shall not be contested by the adverse party.

11.    **NOTICES**

Notices or other written communications required or permitted hereunder shall be sent by a commercial courier for the fastest method of delivery and providing written confirmation of delivery (such as Federal Express or DHL) addressed to the representative addressee, which shall be deemed received seven (7) days after delivery to the courier:

If to Sanford, to:

Sanford, L.P.
2711 Washington Blvd.
Bellwood, Illinois, USA 60104
Attn:  President

With a copy to:

Newell Rubbermaid Legal Services
6833 Stalter Drive
Rockford, Illinois, USA  61108
Attn:  General Counsel

15

If to Luxor, to:

> Luxor Writing Instruments Private Limited
> No. 229, Okhla Industrial Estate, Phase III
> New Delhi – 110 020
>
> Attn.   Mr. D.K. Jain
> with a copy to Ms. Pooja Jain at the same address

If requested by a party, a courtesy copy of any such notice may be sent by facsimile to the number indicated by the requesting party. Such notice also may be provided to a Party at such other address as shall be furnished in writing by Licensee or the Proprietor.

## 12.   SEVERABILITY AND ENTIRETY

If one or more of the provisions hereof shall be void, invalid, illegal or unenforceable in any respect under any applicable law or decision, the validity, legality and enforceability of the remaining provisions herein contained shall not be affected or impaired in any way.

Each Party hereto shall, in any such event, execute such additional documents as the other Party may reasonably request in order to give valid, legal, enforceable effect to any provision hereof which is determined to be invalid, illegal or unenforceable.

It is agreed between the Parties hereto that the terms herein contained are all the terms agreed between the Parties with respect to licensing of Proprietor's Intellectual Property, and the Licensee shall not be entitled to plead any other agreement(s), arrangement or understanding of any nature which have been in force prior hereto. It is agreed that the terms herein shall be varied or altered or modified only in writing signed by the Proprietor or its authorized representative and by the Licensee.

## 13.   APPROVALS

Each Party represents and warrants that it has obtained all necessary internal and corporate approvals to execute this Agreement.

16

14.    **WAIVER**

Failure to exercise any rights under this Agreement by either Party in any one or more instances shall not constitute a waiver of such rights or any other rights in any other instance.

15.    **NON-ASSIGNMENT.**

15.1    Licensee shall not assign or otherwise transfer this Agreement without the prior express written permission of Proprietor. Any purported assignment or transfer, including by operation of law or by merger, shall be null and void. Any assignment by Proprietor shall not materially change the rights of the Licensee hereunder, and shall be with notice to Licensee.

15.2    The rights granted by the Proprietor to the Licensee hereunder are personal to the Licensee and the Licensee shall be the sole manufacturer of the Products.

15.3    If any component of the Products is to be made, as required by the law of India, by another company for Licensee, and such other company (a "Supplier") requires the use of Intellectual Property to manufacture such components, Licensee shall notify Licensee of the identity of each such Supplier. Licensee and its Supplier shall then enter into a "Supplier Agreement" as shown in Schedule B, which Supplier Agreement shall not be effective until Proprietor has indicated its approval of such Agreement. Proprietor's approval of a Supplier Agreement shall not be unreasonably withheld, but Proprietor retains the right to object to any Supplier Agreement on any reasonable basis. If Proprietor fails to disapprove of a Supplier within thirty (30) days of notice of the Supplier by Licensee, that Supplier shall be deemed approved.

Contemporaneously with this document, Licensee shall deliver Supplier Agreements for each of the Suppliers who is presently using Proprietor's Intellectual Property. Each such Supplier shall be deemed approved unless Proprietor, before the signing of this document, has disapproved of the Supplier.

17

It is understood that any breach of a Supplier Agreement by a Supplier shall constitute a material breach by Licensee of this Agreement. In the event of any such breach, Licensee shall terminate the affected Supplier Agreement and shall take such other legal action against the Supplier as to cause Supplier to cease its use of Proprietor's Intellectual Property and any of it. It is understood that the termination of a Supplier within seven (7) days of notice from Proprietor under this Section shall be deemed a cure of Licensee's breach under this Section.

## 16.    INDEMNIFICATION.

16.1    Licensee shall indemnify and hold harmless Proprietor and its Affiliates, and any of their agents, officers, directors, and employees from and against any liability, claim, administrative action, cause of action, suit, damages, and expenses (including reasonable attorney fees and costs), including but not limited to any damages for personal injuries, including death and property damage, which result from Licensee's or any consumer's use or possession of Products; provided this indemnification obligation shall not be construed to co-extend with or impede the indemnification obligations of Proprietor under Article 6.

16.2    The indemnification obligations of Licensee under this Article 16 shall survive termination of this Agreement.

AS WITNESS the hands of the duly authorized officers of the Parties hereto on the day and year first before written.

For **BEROL CORPORATION** (PROPRIETOR)

For **LUXOR WRITING INSTRUMENTS LIMITED** (LICENSEE)

18

## SCHEDULE A

Ongoing Technical Assistance

Proprietor will:

(a)     assist the Licensee in maintaining all the Equipment needed to manufacture Products, and the manufacturing facilities for same, in generally good operating condition and advise on any reconditioning, replacement or other special steps required.

(b)     provide guidance and suggestions to the Licensee so that manufacturing facilities remain at the standards of Proprietor by means of process and quality control improvements;

(c)     carry out audit and review visits to assess the adequacy of all aspects of the Licensee's manufacturing operations relating to Products.

(d)     provide to the Licensee necessary materials and production specifications for manufacture of the Products and advise on procedures for effective evaluation of incoming manufacturing materials and supplies.

19

SCHEDULE B
FORM OF SUPPLIER AGREEMENT

This Supplier's Agreement is made pursuant to the <u>Technical Know-How and Assistance Agreement</u> between Berol Corporation ("Proprietor") and the Luxor Writing Instruments Private Limited ("Luxor"), a copy of which is attached hereto and made apart hereof ("License Agreement").

_____ (full name) located at _____ [address] ("Supplier") desires to manufacture the following items incorporating Proprietor's Intellectual Property:    [insert list of items to be manufactured] ("Items").

Such  Items shall be manufactured only at:  [insert address of manufacturing facility]

As a condition to the manufacture by Manufacturer of any such Items incorporating Proprietor's Intellectual Property, Supplier acknowledges that the Intellectual Property is the sole property of Proprietor, and that Supplier's right to manufacture the Items incorporating Proprietor's Intellectual Property thereon is in all respects subject to the terms and conditions in the License Agreement.

Supplier agrees that the provisions of the License Agreement shall take precedence over and supersede any and all contractual relationships between Luxor and Supplier, and, in particular, Supplier recognizes that all manufacturing rights are subject to (a) the restrictions on the use of the Intellectual Property found in the License Agreement, and (b) the termination provisions in the License Agreement.  Supplier further acknowledges that its manufacture of the Licensed Goods shall give Supplier no right to use the Intellectual Property to make or sell Items (or any other article, product, or good) incorporating Proprietor's Intellectual Property beyond the term of the License Agreement.

Supplier shall not make or sell Items (or any other article, product, or good) bearing incorporating Proprietor's Intellectual Property to any person or entity except Luxor.

Supplier acknowledges that all manufacturing rights cease immediately upon the termination or expiration of the License Agreement  or Luxor's termination of Supplier for any reason.

Supplier acknowledges that its agreement to the terms hereof is consideration for Luxor's agreement to contract for the manufacture and purchase of Items from Supplier.

LUXOR WRITING INSTRUMENTS               [SUPPLIER NAME]:
       PRIVATE LIMITED:

By:_____          By:_____

Its:_____         Its:_____
       Authorized Representative                    Authorized Representative

20